FILED

2026 Jul-02  AM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

KENNETH KAYLON SHELNUTT,           )
                                  )
    Plaintiff,                                 )
                                    )
v.                                                      )   Case No. 5:24-cv-00221-HDM-HNJ
                                    )
JOSH MCLAUGHLIN, *et al.*,                )
                                    )
    Defendants.                              )

## REPORT AND RECOMMENDATION

Plaintiff Kenneth Kaylon Shelnutt ("Shelnutt") filed a *pro se* final amended complaint pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights while housed at the Limestone County Jail.  (Doc. 13).  Shelnutt seeks monetary relief against named defendants Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey in their individual capacities.[1]  (Doc. 13 at 3-6).  Consistent with

---

[1] In his *pro se* final amended complaint, Shelnutt also named Dr. Brady Aderholt, Nurse Hollye Boyd, Corporal Kyle Swart, Sergeant Mark Heard, Sergeant Jacob Lamar, Correctional Officer Tracy Tyler, Sergeant Roy Brooks, and Sergeant Keith Chandler as defendants and sought "disciplinary action for all officers involved."  (Doc. 13 at 3-6, 18).  However, consistent with the undersigned's April 18, 2025, Report and Recommendation, (doc. 27), on June 9, 2025, the court referred the following individual capacity monetary claims to the undersigned: Shelnutt's claims against Sheriff Josh McLaughlin, Jail Administrator Tammy Waddell, and Assistant Jail Administrator Matt Hayes for deliberate indifference to Shelnutt's Fourteenth Amendment right to adequate sanitation from October 18, 2023, through October 25, 2023; Shelnutt's claims against Jail Administrator Tammy Waddell and Assistant Jail Administrator Matt Hayes for deliberate indifference to Shelnutt's Fourteenth Amendment right to adequate hydration from October 18, 2023, through October 25, 2023; and Shelnutt's claims against Corporal Shelly Posey for violations of Shelnutt's Fourteenth Amendment right to be free from excessive force on October 18, 2023.  (Doc. 30 at 9).  The court dismissed Shelnutt's remaining claims without prejudice pursuant to 28 U.S.C. § 1915A(b)(1) for Shelnutt's failure to state a claim upon which relief can be granted and terminated Dr. Brady Aderholt,

its usual practice, the court referred the complaint to the undersigned Magistrate Judge for a preliminary report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

For the following reasons discussed herein, the undersigned Magistrate Judge **RECOMMENDS** the court treat Defendants' motion for summary judgment, (doc. 41), as a motion to dismiss with respect to their argument that Shelnutt has not exhausted his administrative remedies pursuant to 42 U.S.C. § 1997e(a).  The Magistrate Judge **FURTHER RECOMMENDS** the court **GRANT** Defendants' motion and dismiss Shelnutt's claims **WITH PREJUDICE** for his failure to exhaust.

## I.   PROCEDURAL HISTORY

Shelnutt filed his initial *pro se* complaint on February 16, 2024.[2]  (Doc. 1 at 18). On March 14, 2024, the court received Shelnutt's first amended complaint.  (Doc. 6). On April 4, 2024, the court received Shelnutt's Motion to Amend.  (Doc. 8).  On April

---

Hollye Boyd, Corporal Kyle Swart, Sergeant Mark Heard, Sergeant Jacob Lamar, Correctional Officer Tracy Tyler, Sergeant Roy Brooks, and Sergeant Keith Chandler as defendants.  (Doc. 30 at 9-10).

[2] The Clerk of Court docketed Shelnutt's initial complaint on February 23, 2024.  (*See* Doc. 1). However, under the "prison mailbox rule," because a prisoner proceeding *pro se* has virtually no control over the mailing of a pleading, the court deems the pleading filed at the time the prisoner delivers the pleading to prison or jail officials for mailing.  *See Houston v. Lack*, 487 U.S. 266, 270-72 (1988); *Garvey v. Vaughn*, 993 F.2d 776, 783 (11th Cir. 1993) (extending "*Houston* to pro se prisoners filing complaints in section 1983 cases and claims under the Federal Tort Claims Act").  "Absent evidence to the contrary in the form of prison logs or other records," the court assumes a *pro se* prisoner delivered his pleading to prison authorities the day he signed it.  *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (per curiam); *see also Taylor v. Williams*, 528 F.3d 847, 849 (11th Cir. 2008) (assuming *pro se* petitioner delivered his § 2254 habeas petition to prison authorities on the day he signed it). Shelnutt dated his complaint February 16, 2024.  (Doc. 1 at 18).

2

11, 2024, the court granted Shelnutt's motion and ordered him to file a final amended complaint within 30 days. (Doc. 9). The court received Shelnutt's final amended complaint on April 18, 2024. (Doc. 13). On June 9, 2025, the court dismissed all Shelnutt's claims except those seeking monetary damages against Defendants Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey in their individual capacities. (Doc. 30).

The next day, the undersigned entered an Order for Special Report ("OSR") directing the Clerk of Court to forward copies of the final amended complaint to Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey. (Doc. 31 at 1-2, 8). The OSR ordered Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey to file a special report addressing Shelnutt's Fourteenth Amendment excessive force claim against Corporal Shelly Posey; Shelnutt's Fourteenth Amendment adequate sanitation claim against Josh McLaughlin, Tammy Waddell, and Matt Hayes; and Shelnutt's Fourteenth Amendment adequate hydration claim against Tammy Waddell and Matt Hayes. (Doc. 31 at 2-4).

On September 8, 2025, Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey filed a special report with supporting evidence. (Doc. 41). The next day, the court construed the defendants' special report as a motion for summary judgment and notified Shelnutt he had 21 days to respond by filing affidavits or other evidence. (Doc. 43 at 1). The court also advised Shelnutt of the consequences of any default or failure to comply with Rule 56. (Doc. 43 at 1-2); *see Griffith v. Wainwright*, 772

3

F.2d 822, 825 (11th Cir. 1985). The court received Shelnutt's response on September 22, 2025. (Doc. 44).

This case proceeds before the court on Josh McLaughlin, Tammy Waddell, Matt Hayes, and Corporal Shelly Posey's motion for summary judgment. (Doc. 41).

## II. STANDARD OF REVIEW

Because the court construed the defendants' special report as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the motion. Under Rule 56(a), summary judgment stands proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). The moving party has the initial burden of showing there are no genuine issues of material fact, and he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

As the Supreme Court explained:

In our view, the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case

4

necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The non-moving party may establish a genuine issue of material fact through his sworn statement, usually an affidavit, as well as through allegations in a sworn complaint. *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (citations omitted); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form.")). Unless a party's unsworn statement meets the statutory criteria set forth in 28 U.S.C. § 1746,[3] said statement stands "incompetent to raise a fact issue precluding summary judgment" and a district court may not consider it in evaluating a motion for summary judgment. *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (citing *Carr v.*

---

[3] As the Eleventh Circuit explained:

> [U]nder § 1746, a declaration executed within the United States will substitute for a sworn affidavit if the declarant dates and subscribes the document as true under penalty of perjury in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746(2).

> In short, § 1746 has these statutory requirements for an unsworn statement to substitute for a sworn affidavit: The declarant must (1) date and sign the document, and (2) subscribe its content as "true," (3) under "penalty of perjury," (4) in substantially the above-quoted pattern language.

*Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022).

5

*Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (parallel citation omitted)). Furthermore, a non-moving party "'may not rest upon the mere allegations or denials of his pleading,'" but must set forth specific facts showing a genuine issue for trial exists. *See Sears*, 922 F.3d at 1207 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Specific facts consist of "non-conclusory descriptions of specific, discrete facts of the who, what, when, and where variety[,]" "describe the external world as [non-movant] observed it at the time[,]" and "are based on [non-movant's] first-hand personal knowledge, not [non-movant's] subjective beliefs." *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) (parallel citation omitted)).

"'As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.'" *Sears*, 922 F.3d at 1208 (quoting *Feliciano*, 707 F.3d at 1253); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In addition, because the plaintiff proceeds *pro se*, the court must construe the complaint more liberally than a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Roy*, 53 F.4th at 1346. "*Pro se* litigants, however, are required to conform to procedural rules." *Roy*, 53 F.4th at 1346 (citing *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (per curiam)).

## III.  SUMMARY JUDGMENT FACTS

### A.    The Grievance Process

In his initial *pro se* complaint, Shelnutt acknowledged the Limestone County Jail maintained a grievance procedure which covered "[a]ll of [his] claims." (Doc. 1 at 12-13). Each cellblock contains a kiosk which a detainee may use to file grievances. (Doc. 41-2 at 20; *see also* Doc. 41-12 (Waddell Declr.) at 5-6 ¶¶ 13-14). The Limestone County Jail Inmate Rules and Regulations Handbook ("Limestone Handbook") contains a section explaining the jail's grievance procedure for each of the three recognized grievance types – General, Emergency, and Medical. (Doc. 41-2 at 15, 20-21).

The requisite procedures for each grievance type provide as follows:

**General Grievance**

1.    Inmate must submit General Inquiry on kiosk within 72 hours of occurrence[.]

2.    Shift Supervisor or designee will have 7 days to answer the inquiry.

7

    a.     Necessary time to investigate, review all matters.

3.     If Shift Supervisor or designee is unable to resolve the issue, **then** Grievance may be submitted[.]

    a.     After the general inquiry has been answered.

    b.     Must be filed within 24 hours of the answer to the inquiry.

    c.     Must provide proposed solution.

4.     The grievance will be submitted to the Assistant Jail Administrator (AJA) or designee who will reply within 14 business days.

    a.     Necessary time to investigate, review all matters.

5.     Inmate may file an appeal to the grievance response received from AJA.

    a.     Must be filed within 24 hours of reply from AJA.

6.     The appeal will be submitted to the Jail Administrator or designee who will reply within 14 business days[.]

    a.     Necessary time to investigate, review all matters.

7.     Inmate may file a second and final appeal to the grievance response received from Jail Administrator.

    a.     Must be filed within 24 hours of reply from Jail Administrator.

8.     The final appeal will be submitted to the Chief Deputy or designee who will reply within 14 business days.

**Emergency Grievance**

1.     If a grievance is an emergency, which means it needs to be addressed immediately (life safety, missed release dates, medical treatment) there are multiple options to consider:

    a.     Notify Floor Officer

    b.     Use Emergency Call button

    c.     After filing grievance on kiosk, must notify by

emergency call button[.]

2.   Shift Supervisor shall make every effort to resolve the grievance before the end of the shift if time permits.

3.   If determined to not be an emergency, inmate may be instructed to follow general grievance procedure.

## Medical Grievance

1.   Prior to filing grievance, inmate must:

   a.   File a sick call inquiry on the kiosk.

2.   If medical is unable to resolve the issue, then inmate may file a medical grievance.

   a.   Must be filed within 72 hours of sick call reply.

3.   Grievance will be submitted to Medical Unit Director or designee who will reply within 14 days.

4.   If Medical Director is unable to resolve the issue, then inmate may file an appeal to the Jail Administrator who will reply within 30 days.

   a.   Appeal must be filed within 24 hours of reply[.]

5.   If Jail Administrator is unable to resolve the issue, then inmate may file a final appeal to the Chief Deputy who will reply within 30 days.

## Grievance Closure and Review

1.   No inmate will be retaliated against for use of the grievance system; however,

2.   Submitting unsubstantiated grievances in a way that clogs up the system may result in suspension or restriction of kiosk use.

3.   All grievances filed will be accessible by electronic means.

   a.   An inmate may be provided a copy of the grievance upon completion or exhaustion of process

4.   All grievances may be reviewed by Jail Administrator upon completion.

9

5.      Upon release/transfer of custody, inmate must sign a form designating if inquiries and/or grievances shall be closed or require continuance.

(Doc. 41-2 at 20-21) (emphasis in original); *see also* Doc. 41-12 (Waddell Declr.) at 4-5 ¶¶ 11-12).  The following issues may not be grieved at the Limestone County Jail: (1) issues dealing with courts; (2) matters in which jail has no authority or control; (3) jail operations; (4) decisions and procedures of other agencies; (5) disciplinary actions; and (6) classification.  (Doc. 41-2 at 15).

On July 2, 2023, three days after his arrest and booking, Shelnutt acknowledged reading the Limestone Handbook.  (Doc. 41-3 at 2).  Shelnutt subsequently acknowledged reading the Limestone Handbook on July 10, 2023; July 13, 2023; July 24, 2023; August 22, 2023; September 29, 2023 (less than one month before the events made the basis of his complaint); August 13, 2024; and February 13, 2025.  (Doc. 41-3 at 2).

## B.    Shelnutt's Relevant Grievances[4]

Shelnutt suffers from severe mood swings and anxiety stemming from his bi-polar diagnosis.  (Doc. 44 at 3).  He arrived at the Limestone County Jail on June 29, 2023, following his arrest on charges of illegal possession of a credit/debit card, possession of a pistol by a violent felon, possession of a controlled substance –

---

[4] Shelnutt prolifically filed requests on the kiosk at the Limestone County Jail.  (*See generally* Doc. 41-6).  The undersigned recounts only grievances filed during the relevant time frame or filings that concern Shelnutt's claims in this cause of action.

dangerous drugs, and public intoxication.  (Doc. 41-1 at 2, 3).  State officials detained Shelnutt at the Limestone County Jail at all times relevant to his complaint.

On August 12, 2023, Shelnutt filed a general inquiry requesting "protected custody" due to fears jail personnel would poison his food.  (Doc. 41-6 at 46).  On August 14, 2023, Shelnutt filed a second general inquiry asking, "what[']s the problem with answering my other inquir[]y?" (Doc. 41-6 at 46).  That same day, Shelnutt filed a general grievance asking jail officials to respond to the two general inquiries he previously filed.  (Doc. 41-6 at 11).  Corporal Shelly Posey[5] spoke with Shelnutt, who "[a]dmitted he placed inquiries because he was angry." (Doc. 41-6 at 11).  Posey documented the foregoing interaction in the grievance workflow and assigned the grievance back to Shelnutt on August 15, 2023.  (Doc. 41-6 at 11, 46).  Shelnutt closed his inquiries and grievance the next day – August 16, 2023.  (Doc. 41-6 at 11, 46).

Three days later, on August 19, 2023, Shelnutt filed a general grievance claiming: "on 8 12 2023 i filed a protected custody against all the police it took yall 5 days to come talk to me and it was against the kitchen also because ur guards could pay to have me poisoned u still feed me wait till my lawyer gets here next week." (Doc. 41-6 at 12).  Shelnutt's proposed solution consisted of one statement: "fuck u cocksuckers." (Doc. 41-6 at 12).  Non-party Jackie McNatt rejected Shelnutt's grievance as "[u]nfounded"

---

[5] At the time of the events relevant to Shelnutt's complaint, Shelly Posey had reached the rank of Corporal.  (Doc. 41-11 (Posey Declr.) at 2 ¶ 2).  The County has since promoted him to Sergeant.  (Doc. 41-11 (Posey Declr.) at 2 ¶ 2).  This report and recommendation refers to Sergeant Posey as Corporal Posey for ease of reference.

on August 23, 2023, and assigned the grievance back to Shelnutt.  (Doc. 41-6 at 12).

Shelnutt closed the grievance that same day.  (Doc. 41-6 at 12).

On August 22, 2023, Shelnutt filed a general inquiry asking, "why does it take u so long to answer a dam[n] grievance?"  (Doc. 41-6 at 47).  Non-party Sergeant Roy Brooks responded to Shelnutt's inquiry the next day, informing Shelnutt his grievance would be handled in a timely manner.  (Doc. 41-6 at 47).  Shelnutt closed his general inquiry shortly thereafter.  (Doc. 41-6 at 47).

On August 25, 2023, Shelnutt filed a general grievance asking: "why on aug 25th did they wait till 450 to unlock when the handbook states 430?"  (Doc. 41-6 at 13).  Shelnutt proposed the responding officer "tell ur sgt and corp to quit drinkin[g] fire them."  (Doc. 41-6 at 13).  On August 29, 2023, Corporal Posey assigned the grievance back to Shelnutt with the query, "[t]hey didn't unrack until 0450?"  (Doc. 41-6 at 13).  A few hours later, Shelnutt filed a second general grievance claiming, "on aug 29th officer calman didn't unrack on time" and proposed Corporal Posey "fire his ass."  (Doc. 41-6 at 14).  Corporal Posey handled the second grievance "face to face" and assigned the second grievance back to Shelnutt the morning of August 29, 2023.  (Doc. 41-6 at 14).  Shelnutt closed both grievances later that morning.  (Doc. 41-6 at 13-14).

Shelnutt eventually "act[ed] out due to the Limestone County Jail[']s staff and officers."  (Doc. 44 at 3).  Specifically, Shelnutt broke "a couple windows" and "pop[ped] a sprinkler" in September 2023 after being detained for approximately two

12

months.[6]  (Doc. 44 at 3; *see also* Doc. 41-4 at 3-4, 37-44).

On September 9, 2023, Shelnutt filed the following privacy request: "how the fuck u criminal charge me and already charge me restitution r yall stupid guess so well i told u dont put ur bitch ass off[]icers in here with me so im going back on my word." (Doc. 41-6 at 69).  Non-party Jackie McNatt rejected the privacy request on September 11, 2023, due to Shelnutt's noncompliance and informed Shelnutt his privileges would be suspended if he continued to abuse the system.  (Doc. 41-6 at 69).  Shelnutt closed his privacy request two days later – on September 13, 2023.  (Doc. 41-6 at 69).

On September 11, 2023, Shelnutt filed a general inquiry again requesting

---

[6] As early as July 24, 2023, non-party Mark Heard chronicled Shelnutt's threats to "break sprinklers, windows and anything he can until he was released from jail or sent to another facility."  (Doc. 41-5 at 59).  That same day non-party Kyle Swart reported a similar threat coupled with Shelnutt's promise to "continue to be a problem until he was sent to prison where he could smoke a cigarette, and Flakka to get as high as he wanted."  (Doc. 41-5 at 58).

On September 5, 2023, officials reported that Shelnutt shattered the screen on his "chirp" after throwing it at the window.  (Doc. 41-5 at 53-54).  Another official reported Shelnut threw a bar of soap at the window that same day.  (Doc. 41-5 at 55).  Shelnutt pleaded guilty to "repeated violations" and "destroying, altering, or damaging facility property or property of another" after surveillance video captured Shelnutt "throwing object at window causing severe damage" on September 6, 2023.  (Doc. 41-4 at 41-42; *see also* Doc. 41-5 at 51-52).  Lieutenant Jackie McNatt placed Shelnutt on lockdown from September 6, 2023, through October 6, 2023.  (Doc. 41-4 at 41).

Shelnutt subsequently pleaded guilty to "destroying, altering, or damaging facility property or property of another" after surveillance video captured Shelnutt "throwing something small at the window causing it to break" on September 11, 2023.  (Doc. 41-4 at 39-40; *see also* Doc. 41-5 at 47-49).  Lieutenant McNatt placed Shelnutt on lockdown from September 14, 2023, through September 24, 2023. (Doc. 41-4 at 39).  Shelnutt pleaded guilty to three additional offenses for his subsequent actions on September 11, 2023: (1) intentional activation of a smoke/fire alarm; (2) destroying, altering, or damaging facility property or property of another; and (3) creating a disturbance.  (Doc. 41-4 at 37-38).  Shelnutt "created a disturbance by popping the sprinkler head causing his cell to flood and causing the fire alarm to activate."  (Doc. 41-4 at 37; *see also* Doc. 41-5 at 43-46).  For those offenses, Lieutenant McNatt accorded the same discipline levied for the other infraction on September 11, 2023:  lockdown from September 14, 2023, through September 24, 2023.  (Doc. 41-4 at 37).

"protected custody" due to fears jail personnel could be paid to poison him.  (Doc. 41-6 at 48).

Roughly one minute after Shelnutt closed his September 9, 2023, Privacy Request on September 13, 2023, he filed a second privacy request which provided: "u said u was gonna take the 200 dollars back and i take the criminal charge."  (Doc. 41-6 at 69).  On September 14, 2023, Shelnutt filed another privacy request asking to speak with his lawyer and the Alabama Bureau of Investigation.  (Doc. 41-6 at 70).

On September 16, 2023, Shelnutt filed a general inquiry asking to speak with his lawyer.  (Doc. 41-6 at 49).  Shelnutt's disciplinary status prevented his use of the telephone, but Shelnutt insisted "captain said she would let me use the phone up there." (Doc. 41-6 at 49).  That same day, Shelnutt filed a general grievance asking "why havnt you [ ] answered my general inquir[y] and privacy request."  (Doc. 41-6 at 15).  Shelnutt proposed the following solution: "i need you to answer both general and privacy request because i need to speak to my lawyer, the ABI, Alabama Bureau of Investigation, and protected custody on police."  (Doc. 41-6 at 15).  Shelnutt filed a second general grievance on September 16, 2023, because "on 09/195 [sic]/23 corpal posey failed to give me my hour out to take a shower and give me my jumpsuit."  (Doc. 41-6 at 17). Shelnutt requested his "hour out every night before rackdown."  (Doc. 41-6 at 17).

On the same day, Shelnutt also filed a sick call asking to see an eye doctor.  (Doc. 41-6 at 83).  Shelnutt suffered from blurry vision following his two-day exposure to flame-retardant after popping a sprinkler. (Doc. 41-6 at 83).  Non-party Michelle Smith

14

responded to Shelnutt's sick call on September 16, 2023, and Shelnutt closed his request on September 17, 2023.  (Doc. 41-6 at 83).

Shortly thereafter, Shelnutt filed a second sick call asking "to see someone my vision is getting worse from the flame retardant that the Lt. [H]ayes left me in for two days with no shower it[']s getting blurry real bad."  (Doc. 41-6 at 83).  Smith responded to Shelnutt's second sick call on September 17, 2023, and Shelnutt closed his request on September 18, 2023.  (Doc. 41-6 at 83).

Shelnutt filed an emergency grievance on September 18, 2023, complaining jail officials placed mental health medication in his food.  (Doc. 41-6 at 3).  Shelnutt requested a transfer, to speak with his attorney, and the job of Lieutenant Hayes "and everyone involved."  (Doc. 41-6 at 3).  The next day, non-party Jacob Lamar responded: "There is no medication being put in your food," and assigned the grievance back to Shelnutt.  (Doc. 41-6 at 4).  Shelnutt appealed the same day, claiming, "i don't know that im supposed to take your word on it and you tortured me 2 days last week."  (Doc. 41-6 at 4).

On September 19, 2023, Lamar responded to Shelnutt's September 16, 2023, General Inquiry asking to speak with his lawyer and told Shelnutt to ask Gina for a piece of paper to write to his lawyer.  (Doc. 41-6 at 49).  Shelnutt closed his general inquiry later that day.  (Doc. 41-6 at 49).

On September 21, 2023, non-party Mark Heard provided Shelnutt the address for the Bureau of Investigation in response to Shelnutt's September 11, 2023, General

15

Inquiry requesting "protected custody." (Doc. 41-6 at 48).

On that same day, September 21, 2023, non-party Lieutenant Jackie McNatt responded to several of Shelnutt's pending requests. In response to Shelnutt's September 14, 2023, Privacy Request, Lieutenant McNatt informed Shelnutt he could request contact information for ALEA and writing materials from CO Allen, and he could send inner office mail to his attorney. (Doc. 41-6 at 70). Lieutenant McNatt rejected Shelnutt's appeal of his September 18, 2023, Emergency Grievance, again informing Shelnutt officials "do not place medication in foods," and Shelnutt's "tray is prepared just like the other inmates." (Doc. 41-6 at 4). Lieutenant McNatt assigned the grievance back to Shelnutt. (Doc. 41-6 at 4). Lieutenant McNatt also rejected Shelnutt's first September 16, 2023, General Grievance because Shelnutt's "privacy request was answered" and Shelnutt saw his lawyer earlier that day. (Doc. 41-6 at 15). Lieutenant McNatt assigned the grievance back to Shelnutt. (Doc. 41-6 at 15). Finally, Lieutenant McNatt responded to Shelnutt's September 13, 2023, Privacy Request with the following message: "Your message has been received. No further action needed." (Doc. 41-6 at 69).

On September 22, 2023, Shelnutt appealed the rejection of his first September 16, 2023, General Grievance to ascertain the reason Lieutenant McNatt rejected his grievance. (Doc. 41-6 at 16).

On September 25, 2023, Shelnutt closed his September 13, 2023, Privacy Request, (doc. 41-6 at 69), as well as his September 14, 2023, Privacy Request, (doc. 41-

16

6 at 70).  On September 26, 2023, Shelnutt closed his September 11, 2023, General Inquiry.  (Doc. 41-6 at 48).

Captain Tammy Waddell rejected Shelnutt's appeal of his first September 16, 2023, General Grievance on September 28, 2023, reasoning Shelnutt "ha[d] been seen [by] court counsel to file claim or make request for outside sources."  (Doc. 41-6 at 16).  Captain Waddell assigned the grievance back to Shelnutt, who closed the grievance on October 12, 2023.  (Doc. 41-6 at 16).

Non-party Lieutenant McNatt rejected Shelnutt's second September 16, 2023, General Grievance on September 22, 2023, because Shelnutt failed to place a general inquiry before filing his grievance.  (Doc. 41-6 at 17).  Lieutenant McNatt assigned the grievance back to Shelnutt, and Shelnutt closed the grievance that same day.  (Doc. 41-6 at 17).

Shelnut closed his September 18, 2023, Emergency Grievance on October 12, 2023.  (Doc. 41-6 at 4).  That same day, Shelnutt filed a general grievance requesting his "hygiene stuff yall took when i got into trouble in 1202."  (Doc. 41-6 at 18).  Lieutenant McNatt rejected Shelnutt's grievance on October 17, 2023, because Shelnutt had already received his hygiene items.  (Doc. 41-6 at 18).  Shelnutt closed the grievance on February 4, 2024.  (Doc. 41-6 at 18).

On October 9, 2023, Shelnutt filed a general inquiry requesting his "personal hygiene, soap dish, bowl."  (Doc. 41-6 at 49).  Shelnutt filed a privacy request requesting his "personal hygiene, soap dish, bowl, etc." that same day.  (Doc. 41-6 at 71).  On

17

October 12, 2023, Lieutenant McNatt asked Shelnutt if his October 9, 2023, Privacy Request had been handled. (Doc. 41-6 at 71). Shelnutt denied such. (Doc. 41-6 at 71). In response to his general inquiry, non-party Sergeant Roy Brooks informed Shelnutt on October 13, 2023, that Corporal Swart was getting it for him. (Doc. 41-6 at 49). Shelnutt closed his inquiry that evening. (Doc. 41-6 at 49).

On October 13, 2023, Shelnutt filed a general inquiry asserting he should "get taken out twice a week like everybody else" because "it[']s [his] right to get fresh air and sun." (Doc. 41-6 at 50). That same day, Shelnutt filed a privacy request seeking the same privilege. (Doc. 41-6 at 72).

In response to his October 9, 2023, Privacy Request, Lieutenant McNatt informed Shelnutt on October 17, 2023, that jail personnel would return his hygiene items later that day. (Doc. 41-6 at 71). Shelnutt closed his request on October 18, 2023. (Doc. 41-6 at 71).

On October 18, 2023, Shelnutt filed the following sick call request: "hey hollye on june 29th when I came in i had to be taken to the hospital did the jail get billed or my person because i was in custody and my folks said i got a bill just wondering." (Doc. 41-6 at 84). The next day, Nurse Hollye Hill informed Shelnutt, "You were billed because you were brought to the jail and refused by medical staff until after you[] were cleared medically by the ER." (Doc. 41-6 at 84).

On October 19, 2023, around 4:30 p.m. in cell D-3-01, Shelnutt blocked the

18

surveillance camera with wet toilet paper.[7]  (Doc. 44 at 3; *see also* Doc. 41-5 at 28).  Non-party Corporal Swart unblocked the camera.  (Doc. 44 at 3).  After Corporal Swart unblocked the camera "a couple of times," he took Shelnutt's belongings, including his hygiene supplies, jumpsuit, and clothes.  (Doc. 44 at 3; *see also* Doc. 41-5 at 28 (Corporal Swart's report he removed "all of [Shelnutt's] hygiene products and towel and rag" along with "any other item that could have been used" to block the camera's view after Shelnutt blocked the camera's view first with wet toilet paper and then hair gel after the wet toilet paper was cleaned off and then threatened "to do anything he could to block the camera" and "make y'all work tonight")).

The next day, on October 20, 2023,[8] Shelnutt continued to act out because jail officials refused Shelnutt's requests for a toothbrush.  (Doc. 44 at 3).  Around 3:00 p.m., Shelnutt tied a sheet from his cell door to his cell window and then flooded[9] his cell.  (Doc. 44 at 3, 4).  Corporal Posey entered Shelnutt's cell after Shelnutt flooded it and pulled his taser.  (Doc. 13 at 14; Doc. 44 at 3).  Corporal Posey ordered Shelnutt "to get

---

[7] Jail records reflect Shelnutt also removed a screw from a light fixture to throw at the camera and broke the window in his cell earlier that day.  (Doc. 41-4 at 35; Doc. 41-5 at 26-27, 29-32; Doc. 41-12 (Waddell Declr.) at 6 ¶ 15).

[8] In his final amended complaint, Shelnutt alleged the incident with Corporal Posey occurred on October 18, 2023.  (Doc. 13 at 14).  However, the jail's internal documents indicate the incident occurred on October 20, 2023.  In his reply, Shelnutt acknowledges the incident occurred on October 20, 2023, and explains he "got the dates wrong."  (Doc. 44 at 1).

[9] Jail personnel consider "any event when an inmate is filling his cell with water" a "flood." (Doc. 41-11 (Posey Declr.) at 3 ¶ 9).  The term "should not be understood to incorporate any connotations such a word may have of a great volume of water."  (Doc. 41-11 (Posey Declr.) at 3 ¶ 9).

face down in the water." (Doc. 13 at 14).  After Shelnutt asked to speak with a sergeant or lieutenant, Corporal Posey denied Shelnutt's request, tazed Shelnutt, put him in the water, handcuffed Shelnutt, and then placed Shelnutt in a "torture device" called "the wrap" "for hours on end." [10]  (Doc. 13 at 14; *see also* Doc. 6 at 22; Doc. 44 at 11).

---

[10] Defendants submitted footage of the October 20, 2023, incident captured by the video surveillance camera in Shelnutt's cell. (*See* Doc. 41 at 3).  The video contains no audio but stands largely consistent with Shelnutt's version of events as well as the defendants' version of events. (*See generally* Doc. 41-15 (Video Surveillance)).

The video depicts Shelnutt ripping his bed sheet, tying the pieces together, and then tying one end to his cell door, and the other end to the window. (Doc. 41-15 (Video Surveillance) at 0:00:00-0:04:20). Jails personnel eventually reached through the food slot in Shelnutt's cell door and cut the sheet, removed Shelnutt from his cell, and removed the sheet from Shelnutt's cell. (Doc. 41-15 (Video Surveillance) at 0:04:20-0:06:00).

Upon his return to the cell, Shelnutt repeatedly throws one of his slides at the video camera, drinks water from his cup, shoves his cup in the toilet, and repeatedly flushes the toilet, causing water to overflow. (Doc. 41-15 (Video Surveillance) at 0:06:40-0:08:55).  Once water completely covers his cell floor, Shelnutt stops flushing the toilet and uses his bed mat to push water under his cell door. (Doc. 41-15 (Video Surveillance) at 0:08:55-0:10:33).  Shelnutt then places his mat back on the concrete bed, removes the cup from the toilet, places the cup back on the sink, and sits on his bed. (Doc. 41-15 (Video Surveillance) at 0:10:33-0:11:05).

Shelnutt sits on the bed for approximately 30 seconds, stands up, walks toward the camera, and then repeatedly throws his slides at the camera. (Doc. 41-15 (Video Surveillance) at 0:11:05-0:11:52). Shelnutt then uses the slides to push water under his cell door. (Doc. 41-15 (Video Surveillance) at 0:11:52-0:12:56).

Corporal Posey enters Shelnutt's cell with his Taser drawn shortly thereafter, and the two converse. (Doc. 41-15 (Video Surveillance) at 0:13:14-0:13:29).  Two additional officers enter Shelnutt's cell and remove Shelnutt's possessions. (Doc. 41-15 (Video Surveillance) at 0:13:29-0:13:55).  All three officers exit the cell while Shelnutt remains locked inside. (Doc. 41-15 (Video Surveillance) at 0:13:50-0:13:55).

One of the officers returns to confiscate Shelnutt's cup. (Doc. 41-15 (Video Surveillance) at 0:13:55-0:14:06).  When the officer leaves, Shelnutt immediately walks up to the cell door and forcefully kicks the door repeatedly – he then places his hand on the wall perpendicular to the door and kicks the door with the bottom of his foot several times. (Doc. 41-15 (Video Surveillance) at 0:14:06-0:14:16). Shelnutt then sits on his bed and appears to yell. (Doc. 41-15 (Video Surveillance) at 0:14:16-0:14:40). Shelnutt stands up and appears to continue yelling. (Doc. 41-15 (Video Surveillance) at 0:14:40-0:14:46).

Corporal Posey should have loosened "the wrap" roughly every 30 minutes, yet he kept Shelnutt in the device for hours without loosening it;[11] this act caused Shelnutt to be "in a bent position" for hours. (Doc. 13 at 14).

Later that evening, Corporal Posey responded to Shelnutt's October 13, 2023, General Inquiry asking to be "taken out twice a week like everybody else" with the following message: "Your message has been received. No further action needed." (Doc. 41-6 at 50).

Following the October 20, 2023, incident, Captain Waddell, Lieutenant Hayes,

---

Shelnutt sits down when Corporal Posey re-enters his cell with his Taser drawn and pointed at Shelnutt. (Doc. 41-15 (Video Surveillance) at 0:14:45-0:14:48). The two converse, and a second officer carrying a WRAP restraint system enters Shelnutt's cell. (Doc. 41-15 (Video Surveillance) at 0:14:48-0:15:00). Shelnutt remains seated but appears agitated. (Doc. 41-15 (Video Surveillance) at 0:15:00-0:15:14). Corporal Posey tazes Shelnutt, who falls off the bed onto the floor. (Doc. 41-15 (Video Surveillance) at 0:15:14-0:15:20). Two additional officers enter Shelnutt's cell and restrain Shelnutt's legs in the WRAP restraint system while Corporal Posey continues to point his Taser at Shelnutt laying face down on the floor. (Doc. 41-15 (Video Surveillance) at 0:15:20-0:17:40). After his legs are restrained, the officers handcuff Shelnutt, turn him onto his back, and wait for medical personnel to arrive. (Doc. 41-15 (Video Surveillance) at 0:17:40-0:22:10).

When medical personnel arrive, the officers prop Shelnutt against the wall in a seated position and finish restraining him in the WRAP restraint system. (Doc. 41-15 (Video Surveillance) at 0:22:10-0:28:35). The officers and medical personnel then exit the cell. (Doc. 41-15 (Video Surveillance) at 0:28:35-0:29:32). (*See also* Doc. 41-5 at 20-25 (Officers' narratives concerning the events on October 20, 2023)); Doc. 41-11 (Posey Declr.)).

[11] The Limestone County Sheriff's Office policy and procedure governing the WRAP Restraint System requires medical personnel to "assess the condition of restrained persons" every 30 minutes but does not require the loosening of the WRAP every 30 minutes. (Doc. 41-8 at 3; *see also* Doc. 41-11 (Posey Declr.) at 5-6 ¶ 20). The policy further requires a Corrections Officer to "physically check the restraints every 15 minutes for comfort and security" and document said checks "on the restraint log." (Doc. 41-8 at 4). The Corrections Officer "shall observe inmate's extremities closely" for circulation issues or discoloration in the hands and feet. (Doc. 41-8 at 4). If the Corrections Officer identifies circulation issues, he or she must "take immediate action to adjust the restraints for proper circulation" and notify a supervisor as well as medical staff. (Doc. 41-8 at 4).

21

and Sheriff McLaughlin turned off  the water[12] to Shelnutt's cell and would not flush his cell toilet,[13] which forced Shelnut to defecate on his cell floor and stuff his feces under his cell door so he would not have to smell it or live with it.  (Doc. 13 at 12-13; *see also* Doc. 6 at 9).  They refused to provide Shelnutt toilet paper or hygiene products, so Shelnutt had to use toilet water to clean himself after he defecated.[14]  (Doc. 13 at 13).  Shelnutt had to wash his hands in the toilet and then eat with his hands.  (Doc. 13 at 13).  This continued for seven days.  (Doc. 6 at 23).  During this week, Captain

---

[12] Defendant Captain Tammy Waddell authorized the temporary interruption of water to the toilet and sink in Shelnutt's cell.  (Doc. 41-12 (Waddell Declr.) at 7 ¶ 17).  Captain Waddell swears:

> If an inmate demonstrates a pattern of misusing his water (i.e., by attempting to flood his cell), [the Limestone County Detention Facility] may temporarily interrupt the flow of water to the toilet and sink in his cell as an administrative disciplinary action.  Interrupting the flow of water is a case-by-case decision based on the specific circumstances of each inmate, as is the determination of how long such interruption continues.  This tactic is never punitive, and it is reserved for those cases when an inmate has a demonstrated record of using his water in a way that poses a threat to himself, other inmates, and/or LCDF-personnel or property.

(Doc. 41-12 (Waddell Declr.) at 3-4 ¶ 8).

[13] Internal jail records reflect personnel flushed Shelnutt's toilet on October 20, 2023; on October 22, 2023; and October 23, 2025.  (Doc. 41-7 at 13).  Furthermore, "[w]hen the flow of water to an inmate's cell is temporarily paused, [Limestone County Detention Facility] personnel are required to check on him hourly to see if he needs anything (such as having his toilet flushed) . . . ."  (Doc. 41-12 (Waddell Declr.) at 4 ¶ 9).

[14] Defendant Captain Tammy Waddell avers the Limestone County Detention Facility's administrative disciplinary action allowing the restriction of water flow to a prisoner's cell "does not include the restriction of hygiene products of toilet paper, although an inmate is always subject to having access to such items limited to no more than is necessary if he has demonstrated a tendency to misuse them." (Doc. 41-12 (Waddell Delcr.) at 4 ¶ 10).  Following the events of October 20, 2023, Captain Waddell authorized jail personnel to provide Shelnutt "with toilet paper and hygiene products upon his request but no more than was required, given his demonstrated tendency to misuse any objects in his possession."  (Doc. 41-12 (Waddell Declr.) at 7 ¶ 18).

Waddell and Lieutenant Hayes provided Shelnutt three, four-ounce cups of water per day for a total of 12 ounces.[15] (Doc. 1 at 10).

Based upon an officer's statement[16] and video surveillance footage, on October 24, 2023, non-party Lieutenant McNatt adjudicated Shelnutt guilty of the following offenses arising out of Shelnutt's behavior on October 20, 2023: (1) disrespect toward a staff member; (2) creating a disturbance; (3) conduct prejudicial to good order and discipline; (4) being unsanitary or untidy; (5) beating or banging on cell doors, showers, windows, and/or walls; (6) abusive, derogatory, demeaning, or inappropriate speech;

_____

[15] Captain Waddell declares:

> [w]hen the flow of water to an inmate's cell is temporarily paused, [Limestone County Detention Facility ("LCDF")] personnel are required to . . . offer drinking water every four hours and with each meal. If an inmate alerted LCDF guards that he needed water in between those periods, they would be required to provide it. Over the course of a twenty-four-hour period, an inmate whose water has been interrupted will be offered a minimum of sixty-four ounces of water, although they are free to refuse it if they wish.

(Doc. 41-12 (Waddell Declr.) at 4 ¶ 9). At the time relevant to Shelnutt's lawsuit, the Limestone County Detention Facility had not formally codified this policy. (Doc. 41-12 (Waddell Declr.) at 8 ¶ 23). Because officers "were not formally required to record the offers of water in the log of officer interactions with inmates, [ ] the absence of any such entry should not be understood to mean that there was no such offer." (Doc. 41-12 (Waddell Declr.) at 8 ¶ 23). The Limestone County Detention Center "formally codified a version of this system on July 9, 2025." (Doc. 41-12 (Waddell Declr.) at 8 ¶ 23).

[16] Corporal Posey reported:

> Inmate Shelnutt flooded his cell. The water was mixed with urine which the inmate tried to kick on the officers. He repeatedly refused orders to lay on the floor and threatened to physically attack and kill officers.

(Doc. 41-4 at 33).

23

(7) blocking a viewing device, i.e., windows, monitors, mirror, doors; and (8) refusing to promptly obey an order.  (Doc. 41-4 at 33-34).  Lieutenant McNatt removed Shelnutt from the disciplinary hearing "due to his disruptive behavior" and placed him on lockdown from November 8, 2023, through November 28, 2023.  (Doc. 41-4 at 34).

From October 20, 2023, through October 25, 2023, Shelnutt could not file a grievance because jail personnel "held" him in cell D-3-01, a cell equipped with a visitation screen but not a kiosk.[17]  (Doc. 44 at 9).  However, Shelnutt filed a grievance when he "could get down the hall" as soon as he "got in the Cell Block."  (Doc. 44 at 9).  Shelnutt also informed District Court Judge Gray West "on record about it."  (Doc. 44 at 9; *see also* Doc. 1 at 13).

On October 25, 2023, Lieutenant McNatt responded to Shelnutt's October 13, 2023, Privacy Request seeking outdoor access twice a week, informing Shelnutt his message had been received, and he did not need to take any further action.  (Doc. 41-6 at 72).

On November 1, 2023, Shelnutt closed his October 13, 2023, General Inquiry, (doc. 41-6 at 50), as well as his October 13, 2023, Privacy Request, (doc. 41-6 at 72), and October 18, 2023, Sick Call, (doc. 41-6 at 84).  Shortly thereafter, he filed a general

---

[17] Defendant Captain Tammy Waddell insists Shelnutt "had access to a kiosk at all times relevant to his Complaint, even after he was placed on disciplinary lockdown for the events of October 20, 2023." (Doc. 41-12 (Waddell Declr.) at 6 ¶ 14).  Captain Waddell explains "[d]isciplinary lockdown means the inmate is confined to his cell for twenty-three hours a day, but, during his one hour outside of the cell, he may still access the kiosk in his cellblock."  (Doc. 41-12 (Waddell Declr.) at 6 ¶ 14).

inquiry, privacy request, and sick call inquiring about a $10.00 charge to see mental-health personnel.  (Doc. 41-6 at 51, 72, 85).  In his general inquiry, Shelnutt claimed jail personnel sent the psychiatrist and informed Shelnutt he had to take Haldol, a mental health medication, before he could take a shower.  (Doc. 41-6 at 51).  Shelnutt asked for a refund.  (Doc. 41-6 at 51).  Shelnutt's privacy request posed the following query: "captain why am i getting charged for [psychiatrist] when i haven[']t seen her yall made me see her so take that ten dollars off my shit."  (Doc. 41-6 at 72).  In his November 1, 2023, Sick Call, Shelnutt asked the reason LCDC charged him $10.00 to see the physiological nurse when he "never asked to see her period."  (Doc. 41-6 at 85).  Shelnutt requested a refund.  (Doc. 41-6 at 85).

Non-party Nurse Hollye Hill responded to Shelnutt's sick call on November 2, 2023, informing LCDC had charged him for a psych nurse practitioner visit and asking for patience while Laura investigated the matter.  (Doc. 41-6 at 85).

Non-party Sergeant Brooks responded to Shelnutt's general inquiry on November 2, 2023, explaining he would forward the message to Captain Waddell and instructing Shelnutt to "[a]lso put this in a commissary inquiry to Commissary clerk." (Doc. 41-6 at 51).

On November 7, 2023, non-party Lieutenant McNatt responded to Shelnutt's November 1, 2023, Privacy Request and informed him she would "ask medical about this." (Doc. 41-6 at 72).

On November 15, 2023, Shelnutt closed his November 1, 2023, General Inquiry,

25

(doc. 41-6 at 51), as well as his November 1, 2023, Privacy Request, (doc. 41-6 at 72). Shelnutt closed his November 1, Sick Call on January 16, 2024.  (Doc. 41-6 at 85).

Shelnutt claims he exhausted his remedies when he filed a grievance in February 2024 and appealed it.  (Doc. 44 at 9).  He appealed the grievance to the Captain (Jail Administrator) – the "highest" as the Limestone County Jail "only lets you go to Captain (Jail Administrator)."  (Doc. 1 at 13; *see also* Doc. 6 at 13, 19 & Doc. 13 at 20). According to Shelnutt, the rejection of his appeal contained no explanation.  (Doc. 1 at 13).

As to the forgoing averment, Shelnutt appears to refer to his February 14, 2024, Emergency Grievance, which claimed:

> [O]n 09/11/2023 i was disciplined for a destruction of property i was made to sleep without a mat on metal rack for 3 days to 09/13/2023 and also the limestone county jail used torture methods to make me take a mental health medicine called haldol against my will in order to take a shower get my mat back get soap to wash my hands before i ate, etc. then on 10/17/2023 through 10/25/202 the limestone county jail did it again for seven days this time i was on a concrete block without a mat, no toilet paper, soap, no shower, and the water off.  This is when my back went bad now they have me on 5 different meds and still not adequate health care im steadly in pain because the limestone county jail used these methods

(Doc. 41-6 at 8).  Shelnutt requested ten million dollars and his release from jail.  (Doc. 41-6 at 8).

Non-party Mark Heard rejected Shelnutt's grievance two days later, directing Shelnutt to file a regular grievance because Shelnutt's grievance did not concern an emergency, and he assigned the grievance back to Shelnutt.  (Doc. 41-6 at 8).  Shelnutt

appealed that same day explaining "no need i put it [on record] with judge gray west." (Doc. 41-6 at 8). Jackie McNatt rejected Shelnutt's appeal because it did not constitute an emergency and assigned the grievance back to Shelnutt on February 21, 2024. (Doc. 41-6 at 8-9). Shelnutt closed the grievance later that day. (Doc. 41-6 at 9). It does not appear Shelnutt filed a regular grievance as instructed. (*See* Doc. 41-6 at 10-21).

## IV. ANALYSIS

Shelnutt brings three claims for monetary damages against the defendants in their individual capacities: (1) a Fourteenth Amendment excessive force claim against Corporal Shelly Posey; (2) a Fourteenth Amendment adequate sanitation claim against Josh McLaughlin, Tammy Waddell, and Matt Hayes; and (3) a Fourteenth Amendment adequate hydration claim against Tammy Waddell and Matt Hayes. The defendants argue Shelnutt failed to exhaust his administrative remedies for these claims and that they stand entitled to qualified immunity. (Doc. 41 at 16-45). The undersigned agrees Shelnutt's claims warrant denial because he failed to exhaust his administrative remedies. Accordingly, the undersigned does not address the merits of Shelnutt's claims. *See Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004) (characterizing exhaustion of administrative remedies as a "threshold matter" which courts must address before considering the merits of the case).

Section 1997e(a) of Title 42 of the United States Code, as amended by the Prison Litigation Reform Act ("PLRA"), requires the exhaustion of administrative remedies before an action can "be brought with respect to prison conditions under section 1983

27

of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility."   42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").  The PLRA eliminated "the requirement that administrative procedures must satisfy certain 'minimum acceptable standards' of fairness and effectiveness before inmates can be required to exhaust them" and further eliminated "courts' discretion to excuse exhaustion when it would not be 'appropriate and in the interests of justice.'"  *Booth v. Churner*, 532 U.S. 731, 740 n.5 (2001).

Exhaustion of administrative remedies must be "proper."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.  In other words, an institution's grievance procedures determine whether a prisoner properly exhausted his claims.  *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *see also Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008) ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the [institution's] administrative process.'" (quoting *Johnson v. Meadows*, 418 F.3d 1152, 1158

28

(11th Cir. 2005))).    Because exhaustion constitutes an affirmative defense, the defendants bear the burden of proving Shelnutt failed to exhaust his administrative remedies. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008).

The exhaustion defense "is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant*, 530 F.3d at 1374-75 (internal quotation marks and citations omitted); *Trias v. Fla. Dept. of Corr.*, 587 F. App'x 531, 536 (11th Cir. 2014) (per curiam) (finding that the district court properly construed defendant's motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies).    Accordingly, the court should treat the pending motion for summary judgment as a motion to dismiss regarding the contention Shelnutt has not exhausted his administrative remedies pursuant to 42 U.S.C. § 1997e(a).

In deciding whether a prisoner has exhausted his administrative remedies, the court first "looks to the factual allegations in the defendant's motion . . . and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true.    If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Turner*, 541 F.3d at 1082 (citing *Bryant*, 530 F.3d at 1373–74).    "If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.* (citing *Bryant*, 530 F.3d at 1373–74, 1376).    "The judge . . . may

29

consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535 (citing *Bryant*, 530 F.3d at 1376).

To exhaust administrative remedies, a Limestone County Jail detainee generally must submit: (1) a general inquiry to the Shift Supervisor or designee within 72 hours of occurrence; (2) a grievance to the Assistant Jail Administrator or designee within 24 hours of the supervisor's answer to the General Inquiry; (3) an appeal to the Jail Administrator or designee within 24 hours of the Assistant Jail Administrator's response; and (4) a second and final appeal to the Chief Deputy or designee within 24 hours of the Jail Administrator's response.  (Doc. 41-2 at 20-21).  The reviewing authority has seven business days to respond to a general inquiry and 14 business days to respond to a grievance, an appeal, and a second and final appeal.  (Doc. 41-2 at 20-21).

Shelnutt did not exhaust his available administrative remedies as to the claims remaining in this lawsuit.  Following the events of October 20, 2023, Shelnutt had access to the kiosk to file a grievance no later than November 1, 2023.  On that day, Shelnutt closed his October 13, 2023, General Inquiry, (doc. 41-6 at 50), and October 13, 2023, Privacy Request, (doc. 41-6 at 72), and submitted a General Inquiry, (doc. 41-6 at 51),  Privacy Request, (doc. 41-6 at 72), and Sick Call, (doc. 41-6 at 85).  None of Shelnutt's November 1, 2023, submissions reference the events which form the basis of Shelnutt's claims in this action – the October 20, 2023, alleged excessive force

incident with Corporal Shelly Posey; his alleged exposure to feces and inability to clean himself from October 20, 2023, through October 25, 2023; or the alleged limited amount of drinking water jail personnel provided Shelnutt from October 20, 2023, through October 25, 2023.  Rather, in his filings on November 1, 2023, Shelnutt complained of a $10.00 charge on his account for a mental-health appointment he claimed jail personnel forced upon him.  (Doc. 41-6 at 51, 72, 85).

Shelnutt did not mention the October 2023 events in his filings on the jail kiosk until February 14, 2024, when he filed an emergency grievance.  (*See generally* Doc. 41-6).  This grievance failed to comply with the Limestone County Jail's grievance procedures on several fronts.  First, Shelnutt filed an emergency grievance when he should have followed the procedure to file a regular grievance.  When jail personnel informed Shelnutt his grievance concerning events which occurred three months prior did not constitute an emergency and instructed him to file a regular grievance, Shelnutt refused.

Second, Shelnutt should have begun the grievance process no later than October 28, 2023, three days after the conclusion of the October 2023 events on October 25, 2023.  Even if Shelnutt could not access the kiosk to initiate the grievance process at that time, he failed to grieve the events underlying this lawsuit in his November 1, 2023, filings on the Limestone County Jail kiosk.

Third, while Shelnutt's February 14, 2024, Emergency Grievance mentioned the October 2023 events, he failed to provide sufficient detail to place jail administrators

31

on notice of his claims: he did not mention the October 20, 2023, incident where Sergeant Posey purportedly used excessive force; did not mention his exposure to feces and inability to clean himself; and did not mention the failure to provide him adequate amounts of drinking water.

Finally, Shelnutt did not conclude the grievance process prior to filing his lawsuit. He dated his complaint February 16, 2024, a mere two days after he filed his emergency grievance, and Limestone County Jail records reflect Shelnutt did not close his emergency grievance until February 21, 2024, after he filed this lawsuit. (Doc. 41-6 at 8-9).

Shelnutt, arguing "a grievance is a grievance," claims he exhausted his administrative remedies (1) when he filed a grievance in February 2024 and appealed it; and (2) when he told Judge Gray "on record about it" on December 5, 2023. (Doc. 44 at 9). Shelnutt stands incorrect on both counts as neither of these "grievances" comply with Limestone County Jail's grievance procedures.

Shelnutt's February 16, 2024, Emergency Grievance does not constitute proper exhaustion of his administrative remedies for the reasons previously discussed. Shelnutt's December 5, 2023, notification to Judge Gray on the record similarly fails to follow procedures set forth in the Limestone Handbook: Shelnutt did not initiate the "grievance" within 72 hours of the incident. Furthermore, Shelnutt did not file the "grievance" on the kiosk at the Limestone County Jail, which deprived jail officials of the "opportunity to address the grievance internally and rule on the grievance" before

32

Shelnutt filed a complaint in federal court. *Johnson*, 418 F.3d at 1158. "[B]ecause prison officials did not review the merits of [Shelnutt's] complaint - his grievance did not spur the corrective action that might have obviated the need for litigation, there was no filtering of potential frivolous claims, and no development of an administrative record to assist the courts in deciding the controversy." *Id.* at 1159.

While Shelnutt references the "dead end" and "unknowable" exceptions to the PLRA exhaustion requirement articulated by the Supreme Court, (doc. 44 at 9), the record before the court does not establish the applicability of either exception. Shelnutt claims "the jail recognizes none of the grievances that is filed" and "it's a dead end every time." (Doc. 44 at 9). The record belies this assertion as Limestone County Jail personnel responded to each of Shelnutt's grievances.[18] (*See* Doc. 41-6). As to the

---

[18] Of particular note, Corporal Posey personally spoke with Shelnutt about Shelnutt's August 12, 2023, General Inquiry; August 14, 2023, General Inquiry; and August 14, 2023, General Grievance. (Doc. 41-6 at 11, 46). It appears the conversation satisfied Shelnutt as he closed all three filings on August 16, 2023. (Doc. 41-6 at 11, 46). Corporal Posey again addressed Shelnutt's grievances face to face on August 29, 2023, following Shelnutt's repeated complaints about an officer "unracking" late. (Doc. 41-6 at 13-14). Shelnutt closed both grievances after speaking with Corporal Posey. (Doc. 41-6 at 13-14).

On September 19, 2023, non-party Jacob Lamar responded to Shelnutt's September 16, 2023, General Inquiry asking to speak with his lawyer and informed Shelnutt to ask Gina for a piece of paper to write to his lawyer. (Doc. 41-6 at 49). Shelnutt closed his general inquiry later that day. (Doc. 41-6 at 49).

On September 21, 2023, non-party Mark Heard provided Shelnutt the address for the Bureau of Investigation in response to Shelnutt's September 11, 2023, General Inquiry requesting "protected custody." (Doc. 41-6 at 48).

On October 9, 2023, Shelnutt filed a general inquiry requesting his "personal hygiene, soap dish, bowl." (Doc. 41-6 at 49). Shelnutt filed a privacy request requesting his "personal hygiene, soap dish, bowl, etc." that same day. (Doc. 41-6 at 71). On October 12, 2023, Lieutenant McNatt asked Shelnutt if his October 9, 2023, Privacy Request had been handled. (Doc. 41-6 at 71). Shelnutt denied such. In response to his general inquiry, non-party Sergeant Brooks informed Shelnutt on October 13, 2023,

33

"unknowable" exception, Shelnutt does not dispute he had access to the Limestone Handbook explaining the grievance process at the Limestone County Jail. Shelnutt portrayed familiarity with the grievance procedure and an ability to use it by filing multiple grievances.[19] (*See generally* Doc. 41-6).

Because there exists no evidence Shelnutt complied with the Limestone County

---

that Corporal Swart was obtaining the items for him. (Doc. 41-6 at 49). Shelnutt closed his inquiry later that day. (Doc. 41-6 at 49). In response to his October 9, 2023, Privacy Request, Lieutenant McNatt informed Shelnutt on October 17, 2023, that jail personnel would return his hygiene items later that day. (Doc. 41-6 at 71). Shelnutt closed his request on October 18, 2023. (Doc. 41-6 at 71).

On November 1, 2023, Shelnutt filed a general inquiry, privacy request, and sick call inquiring about a $10.00 charge to see mental-health personnel. (Doc. 41-6 at 51, 72, 85). Non-party Nurse Hollye Hill responded to Shelnutt's sick call on November 2, 2023, informing Shelnutt LCDC had not charged him for a psych nurse practitioner visit and asking for patience while Laura investigated the matter. (Doc. 41-6 at 85). Non-party Sergeant Brooks responded to Shelnutt's general inquiry on November 2, 2023, explaining he would forward the message to Captain Waddell and instructing Shelnutt to "[a]lso put this in a commissary inquiry to Commissary clerk." (Doc. 41-6 at 51). On November 7, 2023, non-party Lieutenant McNatt responded to Shelnutt's November 1, 2023, Privacy Request and informed him she would "ask medical about this." (Doc. 41-6 at 72). On November 15, 2023, Shelnutt closed his November 1, 2023, General Inquiry, (doc. 41-6 at 51), as well as his November 1, 2023, Privacy Request, (doc. 41-6 at 72). Shelnutt closed his November 1, 2023, Sick Call on January 16, 2024. (Doc. 41-6 at 85).

[19] Shelnutt's September 16, 2023, General Grievance grieving the administration's failure to answer his general inquiry and privacy request seeking protective custody, an attorney visit, and information relating to the Alabama Bureau of Investigation, demonstrates his understanding of the Limestone County Jail's grievance procedure prior to the October 20, 2023, incident. (*See* Doc. 41-6 at 15-16). On September 16, 2023, Shelnutt filed a General Grievance asking, "why havnt you [ ] answered my general inquir[y] and privacy request." (Doc. 41-6 at 15). Shelnutt proposed the following solution: "i need you to answer both general and privacy request because i need to speak to my lawyer, the ABI, Alabama Bureau of Investigation, and protected custody on police." (Doc. 41-6 at 15). Lieutenant McNatt rejected Shelnutt's grievance because Shelnutt's "privacy request was answered" and Shelnutt saw his lawyer earlier that day. (Doc. 41-6 at 15). Lieutenant McNatt assigned the grievance back to Shelnutt. (Doc. 41-6 at 15).

On September 22, 2023, Shelnutt appealed the rejection of his grievance seeking the reason Lieutenant McNatt rejected his grievance. (Doc. 41-6 at 16). Captain Tammy Waddell rejected Shelnutt's appeal on September 28, 2022, reasoning Shelnutt "ha[d] been seen [by] court counsel to file claim or make request for outside sources." (Doc. 41-6 at 16). Captain Waddell assigned the grievance back to Shelnutt, who closed the grievance on October 12, 2023. (Doc. 41-6 at 16).

Jail's grievance procedure concerning the incidents alleged in the final amended complaint, Shelnutt's Fourteenth Amendment excessive force claim against Corporal Posey; Fourteenth Amendment adequate sanitation claim against Josh McLaughlin, Tammy Waddell, and Matt Hayes; and Fourteenth Amendment adequate hydration claim against Tammy Waddell and Matt Hayes warrant dismissal for Shelnutt's failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).

Although unexhausted constitutional claims generally result in a dismissal without prejudice, Shelnutt's claims are now time barred under the Limestone County Jail's administrative procedure, which requires a general inquiry within 72 hours of the underlying incident. Accordingly, Shelnutt's claims warrant dismissal with prejudice as not properly exhausted and procedurally defaulted. *See Varner v. Shepard*, 11 F.4th 1252, 1264 (11th Cir. 2021) ("Because [plaintiff] did not file a timely grievance and because [the prison] did not waive the procedural defects in the untimely grievances that [plaintiff] did file, [plaintiff] failed to satisfy the PLRA's exhaustion requirement. The district court therefore properly dismissed [plaintiff's] suit with prejudice, and we affirm."); *Bryant*, 530 F.3d at 1375 n.11 ("We decide the case before us: one where dismissal was without prejudice and where neither party has evidenced that administrative remedies at [the prison] are absolutely time barred or otherwise clearly infeasible. We do not mean to say today that a failure to exhaust can never correctly result in a dismissal with prejudice.") (citations omitted); *Johnson*, 418 F.3d at 1159 (holding "that the PLRA's exhaustion requirement does contain a procedural default

35

component").

## VII.  RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** the court treat Defendants' motion for summary judgment, (doc. 41), as a motion to dismiss with respect to their contention Shelnutt has not exhausted his administrative remedies under 42 U.S.C. § 1997e(a).   The Magistrate Judge **FURTHER RECOMMENDS** the court **GRANT** Defendants' motion and dismiss Shelnutt's claims **WITH PREJUDICE** for his failure to exhaust.

## VIII.  NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection.  The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order.  Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

36

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations. The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues.  The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment entered by a District Judge.

**DONE** this 2nd day of July, 2026.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

37